Filed 5/22/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| J.N.,<br><br>    Petitioner,<br><br>        v.<br><br>THE SUPERIOR COURT OF ORANGE COUNTY,<br><br>    Respondent;<br><br>THE PEOPLE,<br><br>    Real Party in Interest. | G055499<br><br>(Super. Ct. Nos. 17DL0388<br>& 16CF0524)<br><br>O P I N I O N |

Original proceedings; petition for a writ of mandate to challenge an order of the Superior Court of Orange County, Lewis W. Clapp, Judge. Petition granted.

Denise Gragg, Associate Defender, and Kenneth S. Morrison, Deputy Associate Defender, for Petitioner, J.N.

Tony Rackauckas, District Attorney, and Holly M. Woesner, Deputy District Attorney, for Real Party in Interest.

No appearance by Respondent.

INTRODUCTION

Petitioner, J.N., who was 17 years old at the time of the alleged offenses, was charged with felonies in the superior court.[1] After the passage of Proposition 57, the Public Safety and Rehabilitation Act of 2016, the superior court suspended criminal proceedings and certified J.N. to the juvenile court to determine whether he should be treated in the juvenile court system or prosecuted as an adult. (Welf. & Inst. Code, §§ 604 [certification process], 707, subd. (a)(2) [juvenile court to decide whether minor should be tried as adult or juvenile]; all further statutory references are to the Welfare and Institutions Code unless otherwise indicated.) The juvenile court determined J.N. was not suitable for treatment in the juvenile court. J.N. filed a petition for a writ of mandate/prohibition, arguing the court abused its discretion in applying section 707.

In making its decision whether the minor should be tried as an adult, the court must consider five statutory factors (§ 707, subd. (a)(2)). Relevant here are two factors, the circumstances and gravity of the charged offense, and whether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction. We find the juvenile court's determination J.N. was not suitable for treatment in the juvenile court was not supported by substantial evidence and was, therefore, an abuse of discretion.[2] The petition is granted.

PROPOSITION 57 & SECTION 707

In 2000, the electorate passed Proposition 21, making changes in the way juveniles are charged with serious offenses. Prosecutors were given the authority to "direct file" a felony complaint in adult court, eliminating the juvenile court's ability to determine at an early stage of the proceedings whether the juvenile should be treated in

---

[1] J.N. was born on June 22, 1997, and the charged offenses were alleged to have occurred on September 7, 2014.

[2] We publish this opinion because the electorate recently approved Proposition 57 and to provide guidance to the courts in deciding these issues.

2

the juvenile court system or transferred to adult court. (§ 707, former subd. (d), as amended by initiative measure (Prop. 21, § 26, approved by voters. Primary Elec. (Mar. 7, 2000), eff. Mar. 8, 2000, repealed by Prop. 57, § 4.2, as approved by voters, Gen. Elec. (Nov. 8, 2016), eff. Nov. 9, 2016.) The voters apparently rethought their votes on Proposition 21 and passed Proposition 57 at the November 8, 2016, general election. (*People v. Cervantes* (2017) 9 Cal.App.5th 569, 596 (*Cervantes*) ["Proposition 57 was designed to undo Proposition 21"], rev. granted May 17, 2017, S241323.) Proposition 57's amendments to section 707 went into effect the next day. (*People v. Superior Court* (*Walker*) (2017) 12 Cal.App.4th 687, 691, disapproved on other grounds in *People v. Superior Court* (*Lara*) 4 Cal.5th 299, 314.)

Proposition 57 terminated the prosecutor's ability to file a criminal complaint against a juvenile in the criminal court without first obtaining authority from a juvenile court judge to treat the juvenile as an adult. "Proposition 57 effectively guarantees a juvenile accused felon a right to a fitness hearing before he or she may be sent to the criminal division for prosecution as an adult." (*Cervantes*, *supra*, 9 Cal.App.5th at p. 597.)

When a minor has been charged in the juvenile court with any felony allegedly committed when he or she was 16 years of age or older, the prosecutor "may make a motion to transfer the minor from juvenile court to a court of criminal jurisdiction." (§ 707, subd. (a)(1).) Upon the making of such a motion, the juvenile court must order the probation department to prepare "a report on the behavioral patterns and social history of the minor." (*Ibid.*) At the hearing on the prosecution's motion, the court considers the probation report and evidence submitted by the minor. (§ 707, subd. (a)(2).) In deciding whether to treat the minor in the juvenile court system or transfer the matter to the criminal court, the court must consider five factors listed in section 707, subdivision (a)(2). (*Ibid.*) Those factors are the minor's degree of criminal sophistication, whether the minor can be rehabilitated in the time before the juvenile

3

court would lose jurisdiction over the minor, the minor's prior history of delinquency, the success of prior attempts by the juvenile court to rehabilitate the minor, and the circumstances and gravity of the charged offense. (§ 707, subd. (a)(2)(A)(i)-(E)(i).) Contrary to former subdivision (c) of section 707, which made a minor presumptively unsuitable for treatment under the juvenile court system if charged with an offense listed in subdivision (b) of section 707 (§ 707, former subd. (c); repealed by Prop. 57, § 4.2, eff. Nov. 9, 2016), the new law contains no such restriction. "If the court orders a transfer of jurisdiction, the court shall recite the basis for its decision in an order entered upon the minutes." (§ 707, subd. (a)(2).)

## FACTS OF THE ALLEGED OFFENSE

J.N. is charged with a murder, but the evidence presented at the hearing in juvenile court established he did not kill anyone. The murder was committed while J.N. and two other minors, including the killer, were tagging (making graffiti) in a rival gang's claimed territory. The killing occurred when the three minors were surprised by an adult rival gang member. The rival approached S.C., who pulled out a gun to scare the man. Undeterred, the man grabbed the gun in S.C.'s hand and a struggle ensued. Shots were fired as they wrestled over the gun. J.N. and the other minor stood frozen[3] nearby.

## PROCEDURAL FACTS

On February 26, 2016, the prosecutor filed a felony complaint charging J.N. with crimes alleged to have occurred on September 7, 2014. He was charged with one count each of murder (Pen. Code, § 187, subd. (a)), vandalism for the benefit of a criminal street gang (Pen. Code, §§ 186.22, subd. (d), 594, subds. (a), (b)(2)(A)), and active participation in a criminal street gang (Pen. Code, § 186.22, subd. (a)). The complaint further alleged the murder and vandalism were committed for the benefit of a

---

[3] J.N. told police he stood "frozen" while the rival and S.C. struggled over the gun. In addressing J.N.'s and A.E.'s action during the encounter, S.C. said, "they stood in shock right there."

criminal street gang (Pen. Code, § 186.22, subd. (b)(1)), that J.N. vicariously discharged a firearm causing death to a non-accomplice (Pen. Code, § 12022.53, subds. (d), (e)(1)), and charged a special circumstance of murder for the benefit of a criminal street gang (Pen. Code, § 190.2, subd. (a)(22)).

Three days later, the prosecutor filed an amended felony complaint naming J.N., S.C., and A.E. as defendants. The charging document noted it was directly filed in the criminal court. The original felony complaint, wherein J.N. was the only named defendant, did not contain the "direct file" designation. It seems the filing deputy did not realize J.N. was a minor at the time of the charged offenses, given more than 17 months passed between the date of the incident and the filing of the original felony complaint. Each of the defendants was a minor on the alleged date of the crimes. The amended complaint re-alleged the same substantive offenses charged in the original complaint. It alleged all three minors committed the murder for the benefit of a criminal street gang (Pen. Code, § 186.22, subd. (b)(1)), J.N. and A.E. vicariously discharged a firearm causing death (Pen. Code, § 12022.53, subds. (d), (e)(1)), S.C. personally discharged a firearm causing death (Pen. Code, § 12022.53, subd. (d)), and all three minors committed a special circumstance, murder for the benefit of a criminal street gang (Pen. Code, § 190.2, subd. (a)(22)).

On April 29, 2016, J.N. appeared in the superior court, entered not guilty pleas, and denied the special allegations. After the public defender and the alternate defender declared conflicts, the court appointed the associate defender to represent J.N.

On November 8, 2016, the electorate passed Proposition 57, the Public Safety and Rehabilitation Act of 2016. One of the five expressly stated goals of the proposition was to "[r]equire a judge, not a prosecutor, to decide whether juveniles should be tried in adult court." (Ballot Pamp., Gen. Elec. (Nov. 8, 2016), Proposition 57, § 2, p. 141.)

5

On February 28, 2017, the parties informed the superior court J.N. was 17 years old at the time of the alleged offenses. The superior court suspended criminal proceedings and certified J.N. to the juvenile court to determine whether he should be treated in the juvenile court system or prosecuted as an adult. (§§ 604, 707, subd. (a)(2).)

The juvenile court began the section 707 hearing on May 16, 2017, and concluded it on June 1, 2017. The court found J.N. suitable under three of the five factors. In making the ultimate suitability finding, the court noted it was giving "a lot of weight" to the evidence of trauma to J.N., the lack of an appropriate role model, and other facts favorable to J.N. The court commented: "This homicide is not as serious as some of the others that this court sees but there is a heavy degree of gravity there, so what I have to do then is decide, given that gravity and given the amount of time we have to rehabilitate, do those factors outweigh the other factors that seem to weigh in his favor and that's where the court finds itself with a difficult decision."

The court found the crime was *not* "particularly sophisticated" because the shooting only occurred as the result of the gang rival's aggressiveness and attempt to take the gun away from S.C. On the issue of the gravity of the offense, the court stated shooting and killing an unarmed person was the gravest of offenses, but conceded the homicide was not as serious as a drive-by shooting, or as serious as some homicides the court has seen.

The court said it agreed with defense counsel's statement the charged murder was on the "low end" of the scale of special circumstance murders. "I agree that it is not the most sophisticated planned out conspiratorial kind of an offense as you say, and I want the record to also reflect that I am giving a lot of weight to trauma and the lack of an appropriate role model, the death of a grandmother who meant a lot to him, having to witness and at least in that sense be a victim himself of domestic violence." The court further considered J.N.'s statement they did not intend to shoot anyone, but instead intended to "'[spray graffiti] and go home.'" The court summed up how the killing

6

occurred: "You had . . . this victim pop out and be aggressive and approach them and start struggling over the gun. That's not sophisticated. That is just something that happened while they were writing on the wall. So, I don't see it as being that sophisticated." Based on the gang rival's aggressive behavior in approaching S.C., attempting to take the gun from S.C., wrestling over the gun, and the fact the rival probably had his hands on the gun when the shots were fired, made the court's decision "a tough call." The court also acknowledged it appeared the shooting was a shock to J.N. and A.E. who froze when they saw what was happening. The court concluded those factors favored a finding of suitability. The court found prior efforts at rehabilitation weighed in J.N.'s favor because significant efforts at rehabilitation had not been undertaken.

The fact that appeared to weigh most heavily in the court's mind against finding J.N. suitable for treatment in the juvenile court system was the fact he was 20 years old at the time of the hearing. This meant the juvenile court system would lose jurisdiction over J.N. when he turned 23 years old. The court acknowledged J.N. had done "pretty well" in custody and was going to graduate from high school.

The court found the trauma suffered by J.N. had a mitigating effect, but not enough to reduce the gravity of the offense and the amount of time the juvenile court could exercise jurisdiction to rehabilitate him. The court concluded the prosecution proved by a preponderance of the evidence J.N. was unsuitable for treatment in the juvenile court system. The court transferred the matter back to adult court for reinstatement of the felony complaint.

J.N. filed a petition for a writ of mandate/prohibition. In his petition, J.N. alleges the court abused its discretion by substituting a "'litmus test'" and failing to consider relevant factors in evaluating the five specific criteria mandated by section 707, subdivision (a)(2), improperly evaluated the criteria, and applied the wrong burden of proof. We agree.

7

STANDARD OF REVIEW

We review the juvenile court's finding the minor was unsuitable for treatment in the juvenile court for error under an abuse of discretion standard. (*People v. Superior Court (Jones)* (1998) 18 Cal.4th 667, 681.) "There must be substantial evidence adduced at the hearing that the minor is not a fit and proper subject for treatment as a juvenile before the court may certify him to the superior court for prosecution. [Citations.]" (*H. v. Superior Court* (1970) 3 Cal.3d 709, 715.)

In reviewing the juvenile court's decision, "[t]he . . . court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711-712, fns. omitted.) "All exercises of discretion must be guided by applicable legal principles . . . . [Citations.] If the court's decision is influenced by an erroneous understanding of applicable law or reflects an unawareness of the full scope of its discretion, the court has not properly exercised its discretion under the law. [Citation.] Therefore, a discretionary order based on an application of improper criteria or incorrect legal assumptions is not an exercise of informed discretion and is subject to reversal. [Citation.]" (*Farmers Ins. Exchange v. Superior Court* (2013) 218 Cal.App.4th 96, 106.) The "discretion must be exercised in accordance and in the framework prescribed by the Legislature." (*Bruce M. v. Superior Court* (1969) 270 Cal.App.2d 566, 573.)

DISCUSSION

To justify the transfer of a minor from juvenile court to the criminal court system, the prosecution bears the burden of establishing by a preponderance of the evidence the minor is not a suitable candidate for treatment under the juvenile court system. (Cal. Rules of Court, rule 5.770(a); Evid. Code, § 606.) There are five statutory factors. The court shall consider the five factors and recite the basis for its decision in an order entered upon the minutes. (§ 707, subd. (a)(2).)

8

Glenn Blanton, a deputy probation officer, prepared the suitability report on J.N. addressing the factors. The report recommended the court find J.N. not suitable for treatment in the juvenile court system. The court reviewed and considered the report before making its suitability finding. In addition to the report, the court received and considered testimonial evidence.

There is no dispute on appeal the court found J.N. suitable under three of the five factors. We will first discuss the three factors the court found in favor of suitability and then discuss the two factors the court found in favor of unsuitability. The factors found in favor of suitability were criminal sophistication, prior delinquent history, and success of previous attempts to rehabilitate the minor.

## I. Criminal Sophistication

Pursuant to section 707, subdivision (a)(2)(A)(i), the juvenile court is to consider the minor's criminal sophistication. "When evaluating [this] criterion . . . , the juvenile court may give weight to any relevant factor, including, but not limited to, the minor's age, maturity, intellectual capacity, and physical, mental, and emotional health at the time of the alleged offense, the minor's impetuosity or failure to appreciate risks and consequences of criminal behavior, the effect of familial, adult, or peer pressure on the minor's actions, and the effect of the minor's family and community environment and childhood trauma on the minor's criminal sophistication." (§ 707, subd. (a)(2)(A)(ii).) The court found this factor weighed in favor of suitability.

Under the heading "degree of the criminal sophistication of the minor," the report stated the shooting occurred during the tagging episode when a rival gang member confronted the minors, the armed companion brandished the gun, and after the companion and rival struggled for control of the gun, the companion regained control of the gun and shot and killed the rival. The report stated J.N.'s actions were "intentional as he engaged in the defacing of property and was willing to back up his friend during the fight." On being questioned by J.N.'s counsel, Blanton said he "unfortunately" relied

9

more heavily on the police report than on J.N.'s and S.C.'s statements to the police. The report stated J.N. told police he associated with members of Townsend Street in the past, but no longer did so. Blanton did not know J.N. and his family had moved from Townsend Street. Blanton said he was busy preparing other reports at the time.

Blanton agreed the report mistakenly says J.N. continued to support the F-Troop gang when, in fact, he never supported F-Troop. Blanton also agreed J.N. handled his first diversionary probation well. He further stated no probation violations were noted after J.N.'s release from juvenile hall. The report also stated J.N. had been involved in physical altercations while in juvenile hall, although there was no notation of any being gang related.

Blanton admitted he did not factor into the sophistication of the minor, the fact the shooting did not occur until there was a hand-to-hand struggle over the gun. Additionally, the report stated the fact J.N. "'fr[oze] up'" during the incident did not excuse the fact he and the others were tagging and knew it was dangerous.

The court noted the victim surprised the minors, was aggressive, approached them, and struggled with S.C. over the gun. The shooting occurred as they struggled over the gun. The court observed, "That's not sophisticated."

Extensive evidence was offered as to J.N.'s upbringing. J.N.'s father (Father) was 15 years older than his mother (Mother). After they were married, Mother discovered Father was already married and had a family, including two children, in Mexico. Father abused Mother while she was pregnant. He wanted Mother to abort the pregnancy with their first daughter. Father also abused Mother while she was pregnant with J.N.

Father had a bad temper and got angry easily. He praised the children half the time and belittled them the other half. When the children fought, he yelled "ugly things" at them and hit them with whatever he could find, including a belt or a shoe. He also used his hand, open and closed into a fist. Father beat J.N. with a lanyard, resulting

10

in a black eye and bruises when J.N. was five or six years old. Once at a swap meet, Father hit J.N. in the head because J.N. was not wearing a hat. When Father would physically abuse J.N., J.N. would not fight back. When Mother sought to intervene, Father would focus his abuse on her. Although Mother said the children loved and feared their father, J.N.'s older sister said she hated Father.

In the final act of physical abuse prior to their separation, Father gave Mother a black eye. When Father was released from jail, Mother obtained a restraining order against him. He did not comply with the order. He followed her to work and went to the children's school to pick them up.

Mother's sister confirmed Father's violent nature. The first time she observed the effects of the domestic abuse was when J.N.'s older sister was almost a year old and Mother "had a purple eye." In 2006, Mother called her sister and when she arrived at the family residence, she saw Mother had another black eye and was crying. The children saw it too. J.N., his older sister, and his older brother all sat on the couch, shaking and nervous.

The family lived in Anaheim when J.N. was born. The family later moved to Santa Ana and then to Orange. They moved from Orange when J.N.'s parents separated in November 2006. Mother's sister asked Mother and the children to move in with her so Mother would be safe. Mother agreed and they moved in with her sister and the children's great grandmother in Santa Ana. Problems soon arose because Mother would sneak her boyfriend (boyfriend) into the residence. Mother was given the option of staying without the boyfriend or moving out. She chose to move out. The family moved four times that year.

J.N. was quiet and timid growing up. He never went outside to play with other children in the neighborhood. Boyfriend told Mother not to let the children see Father. Still, the children would sneak out of the house to see him. J.N. told the probation officer who prepared the suitability report the children did not like boyfriend

11

because he was jealous of Father's relationship with his children. On one occasion, boyfriend pushed J.N.'s older brother against a wall and choked him. The other children were aware of the incident, and when they told Mother, she did not believe them.

J.N. went one year without seeing Father after his parents separated. When the children did see Father, he continued to punish and hit the children. When J.N. was younger and chubby, Father would call him a cow.

Mother eventually ended her relationship with boyfriend, but Mother subsequently had a series of other boyfriends. In all, four other men lived with the family from time to time. When Mother had a man living with her, she neglected and abused the children. In those times, J.N.'s older sister assumed the role of parenting to her siblings.

The family moved frequently because Mother could not pay the rent. At times, they lived in extremely crowded quarters because non-family members joined the household. There were times when Mother did not have enough money for food or shoes, despite working six nights a week. J.N.'s older sister said they would eat "cup of noodles" and drink water from the sink. On occasion, some friends at work gave Mother $20 a day so she could feed her children.

The financial stress also affected Mother's ability to control her temper. When she abused the children, she usually used her hands, a belt, or some other instrument. A social worked contacted Mother about domestic violence in 2007. Mother admitted having hit J.N. with a belt, leaving a bruise. The social worker suggested therapy, and Mother took some domestic violence classes. Mother said the counseling helped and she did not hit the children as much thereafter. J.N.'s older sister had additional counseling because she was depressed, suicidal, and cut herself.

Mother moved the family a fourth time after leaving her sister and her grandmother's residence to a one-bedroom apartment on Townsend Street. Mother knew it was a dangerous area with "a lot of dangerous guys there," but it was all she could afford. J.N.'s older sister said they were used to living "in nice places where it is very

12

quiet," but Townsend Street was quite different. J.N. was about 12 years old when they moved to Townsend Street.

The children would frequently hear shootings on Townsend Street. The family was afraid and would drop to the floor when shots were fired. J.N. slept on the living room floor. Mother worked from 9:00 p.m. to 6 a.m. J.N. was aware of incidents on Townsend Street, including a teenager being stabbed at a nearby elementary school, and a woman pulling a gun on a police officer in the alley and being shot and killed. J.N. refused to go outside the first year they lived on Townsend Street. He was the last of the children to socialize because he refused to go outside for almost one year.

Mother said Townsend Street changed J.N. because he was always "surrounded by those guys," and she failed to supervise him because she worked nights at a bakery. Mother did not pay much attention to the children when she started working. Mother remembered a police officer once came to the apartment and told her J.N. had been shot three times in the leg. The incident changed him. He again did not want to go outside the apartment. He was afraid to go to school and asked to, and did, transfer schools. J.N.'s sister and aunt confirmed his changed behavior.

In 2015, J.N. was released from juvenile hall, he got a job at the same bakery as Mother and routinely worked 12-hour shifts. J.N. kept his appointments with his probation officer. If Mother did not take him to see the probation officer, he rode his skateboard there. He followed all probation's rules and did not break any laws after being released from juvenile hall. He was always home by the 10:00 p.m. curfew and performed the required 52 hours of community service well before the deadline. He did not want to do anything wrong because he did not want to go back into custody. J.N.'s older sister saw a change in J.N.'s attitude when he was released from juvenile hall. He was more mature and had goals. He was working, took a class, and received a diploma. He stayed home more when he was not working.

13

J.N. lived with Mother's sister until May 2016, when he was arrested on the present matter. When taken to the jail, J.N. asked to be placed into protective custody to separate "himself from the other guys" (gang members). He told Mother about a friend who came to visit him and told him about things going on in the street, but J.N. said he did not want to know about it. Mother was afraid to tell the friend's mother not to let her son visit J.N. because "they" know where she lives and she was afraid for the safety of her other children. Still, she sent the mother of the visitor a message through a cell phone application and asked the son to not visit J.N. She said her family was united in its support of J.N.

After considering the circumstances surrounding the offense and the extensive evidence on J.N.'s upbringing, the court found this factor favored suitability. Substantial evidence supports the court's finding.

## II. *Prior Delinquent History*

Section 707, subdivision (a)(2)(C)(i), requires the court to consider "[t]he minor's previous delinquent history." In doing so, the court "may give weight to any relevant factor, including, but not limited to, the seriousness of the minor's previous delinquent history and the effect of the minor's family and community environment and childhood trauma on the minor's previous delinquent behavior." (§ 707, subd. (a)(2)(C)(i).) The court found this factor weighed in favor of J.N.

The suitability report stated J.N.'s prior contacts were "minimal, but escalating in seriousness." According to the report, at the time of the charged incident J.N. had two prior contacts with the juvenile court. In 2012, J.N. was charged with fighting in public and was diverted. It appears diversion was modified to informal probation the next day and he successfully completed probation approximately four months later. In 2014, J.N. was referred to juvenile court for being truant from school. As a result, he was ordered to provide monthly attendance reports, complete any previously imposed school detentions, and maintain acceptable grades and attendance.

14

The petition was dismissed approximately nine months later. In 2015, after the date of the charged offenses, he was arrested for a strong-armed robbery wherein he took $25 from another boy, and was placed on probation. When he was released from juvenile hall on probation, J.N. moved in with Mother. Mother told J.N. she was happy to see he wanted to get his life straight, go to school, and find a job. He said he was working on it and gave no indication of any intent to remain with the gang.

At the time of the charged incident, J.N. had two prior contacts with the juvenile court. The court found this factor favored suitability. Substantial evidence supports the court's finding.

*III. Success of Previous Attempts to Rehabilitate the Minor*

In determining suitability the court must consider the "[s]uccess of previous attempts by the juvenile court to rehabilitate the minor." (§ 707, subd. (a)(2)(D)(i).) In evaluating this criterion, the court "may give weight to any relevant factor, including, but not limited to, the adequacy of the services previously provided to address the minor's needs." (§ 707, subd. (a)(2)(D)(ii).) The court found this factor weighed in favor of J.N., as did the fitness report.

The diversion, or informal probation imposed on the charge of fighting in public when J.N. was 15 years old, did not contain any programs or counseling and lasted approximately four months before it was deemed successful and terminated. Additionally, the terms imposed on his truancy petition did not contain any programs or counseling and the sanctions were terminated without violation approximately nine months after they were imposed.

The court noted, prior attempts to rehabilitate J.N. "had not been significant." The court found this factor favored suitability. Substantial evidence supports the court's finding.

15

We now turn to the two factors the court found favored unsuitability. The factors found in favor of unsuitability were possibility of rehabilitation and gravity of the offense.

## IV. *Possibility of Rehabilitation*

The court must determine whether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction. (§ 707, subd. (a)(2)(B)(i).) In making this finding, the court may give weight to any relevant factor, "including, but not limited to, the seriousness of the minor's previous delinquent history and the effect the minor's family and community environment and childhood trauma on the minor's previous delinquent behavior." (§ 707, subd. (a)(2)(B)(ii).) When a delinquent minor reaches the age of 23 years of age, the juvenile court system loses jurisdiction over the minor. (§§ 1769, subd. (c), 1771, subd. (b).)

In his suitability report, the probation officer stated that if J.N. were committed to the California Department of Corrections and Rehabilitation Division of Juvenile Justice, he "would undergo a 45-day orientation process during which he would be assessed for mental and behavioral health treatment needs. Based upon assessment findings, the youth would be offered various evidence-based interventions which could include Gang Intervention program, Aggression Interruption Training (AIT), Cognitive Behavioral Interventions for Substance Abuse (CBI-SA), and/or CounterPoint, a cognitive behavioral program designed for males at high risk for recidivism." Then, without any analysis, the report concludes: "Therefore, under this criterion, the minor appears to be unsuitable to be dealt with under the Juvenile Court law."

The court found J.N. was not an appropriate candidate for treatment in the juvenile justice system under this criterion, stating J.N. would turn 20 years old within a month of the hearing and the fact he could remain in the juvenile court system only until he turns 23 years old "weigh[ed] against a finding of suitability." The court recognized J.N. was about to graduate from high school and "he has come a long way in custody."

16

The court posed the ultimate issue: "[G]iven that gravity and given the time we have to rehabilitate, do those factors outweigh the other factors that seem to weigh in his favor and that's where the court finds itself with a difficult decision." The court's finding of unsuitability under this factor was not supported by substantial evidence.

The prosecution bears the burden of producing evidence of insufficient time to rehabilitate the minor. (Cal. Rules of Court, rule 5.770(a); Evid. Code, § 606.) Expert witnesses may testify on the issue of the availability of treatment programs in the juvenile court system and the amenability of the minor to those programs. (*H. v. Superior Court*, *supra*, 3 Cal.3d at pp. 714-715.) In those cases where the juvenile court might decide treatment as a juvenile would be in the minor's best interest, the court could still find the minor "unfit *if* those experts testified that rehabilitation might require treatment beyond the date of his mandatory discharge. [Citations.]" (*Id*. at p. 715, italics added.)

Here, the prosecution did not present any expert testimony concerning the programs available, the duration of any of the programs, or whether attendance would rehabilitate J.N. before termination of the juvenile court's jurisdiction. There was no evidence that demonstrated existing programs were unlikely to result in J.N.'s rehabilitation, why they were unlikely to work in this case, or that they would take more than three years to accomplish the task of rehabilitating J.N.

Even if we were to accept the probation officer's conclusion in the suitability report as an expert opinion, and we do not, the conclusion under this factor was not supported by the evidence. "If we could accept plaintiff's expert witnesses' testimony *at face value*, this testimony would itself support the trial court's findings. However, we may not do so. '"The chief value of an expert's testimony in this field, as in all other fields, rests upon the *material* from which his opinion is fashioned and the *reasoning* by which he progresses from his material to his conclusion; . . . it does not lie in his mere expression of conclusion."' [Citation.] 'Where an expert bases his conclusion upon assumptions which are not supported by the record, upon matters which

17

are not reasonably relied upon by other experts, or upon factors which are speculative, remote or conjectural, then his conclusion has no evidentiary value. [Citations.] In those circumstances the expert's opinion cannot rise to the dignity of substantial evidence. [Citation.] When a trial court has accepted an expert's ultimate conclusion without critical consideration of his reasoning, and it appears the conclusion was based upon improper or unwarranted matters, then the judgment must be reversed for lack of substantial evidence.' [Citation.] 'If [the expert's] opinion is not based upon facts otherwise proved, or assumes facts contrary to the only proof, it cannot rise to the dignity of substantial evidence.' [Citation.]" (*People v. ConAgra Grocery Products Co.* (2017) 17 Cal.App.5th 51, 82-83 (*ConAgra*).

The probation officer's opinion in his report was not substantial evidence because the *opinion* lacked support by substantial evidence. (*ConAgra*, *supra*, 17 Cal.App.5th at p. 83.) There was no evidence as to the efforts necessary to rehabilitate J.N. and no evidence as to why available programs were unlikely to result in rehabilitation in the time allotted. This lack of evidence rendered any opinion based on the report without evidentiary value. Therefore, the prosecution failed to establish by a preponderance of evidence J.N. was unsuitable for treatment in the juvenile court. The court's finding J.N. was unsuitable was not supported by substantial evidence and was, therefore, an abuse of discretion.

*V. Circumstances & Gravity of the Charged Offense*

In determining this factor, the court may consider and "give weight to any relevant factor, including but not limited to, the actual behavior of the person, the mental state of the person, the person's degree of involvement in the crime, the level of harm actually caused by the person, and the person's mental and emotional development." (§ 707, subd. (a)(2)(E)(ii).)

In his suitability report, the probation officer stated J.N. knew S.C. was armed when they entered gang rival territory and knew there could be a dangerous

18

physical assault if confronted by rival gang members. The officer said J.N.'s and his companions' actions were "extremely serious inasmuch as a human being lost his life." Again, without any analysis, the report concludes: "Therefore, under this criterion, the minor appears to be unsuitable to be dealt with under the Juvenile Court law."

The court agreed this was not a sophisticated, planned murder. It also stated what "was going on in [J.N.'s] mind at the time of the actual shooting, and those things come down in favor, I think, of finding suitability." The court opined all the evidence at the hearing indicated the murder would not have occurred had the gang rival not aggressively approached S.C., grabbed the gun, and attempted to take it from S.C. after S.C. initially displayed the weapon. S.C. said he pulled the gun on the gang rival "just to scare him off," but the rival did not leave. As the court noted, "That's not sophisticated. That is just something that happened while they were there writing on the wall." After noting the killing did not occur until the gang rival engaged S.C. in a struggle over the gun, the court stated, "So, I have to say that it is a tough call because you have a victim who aggressively approached the shooter, tried to take the gun away from him, . . . and now there's a struggle over that gun, that firearm, and the gun goes off." Importantly, "while [S.C. and the gang rival] are struggling over the gun, [J.N.] and the other person sit back -- they don't sit back, they stand pretty quiet and pretty frozen, to use the word used by [J.N.], just frozen while they are watching what is going on. It seems so unexpected to them." (Fn. added.) The court then stated, "So, I bring that up in the context of what was going on in his mind at the time of the actual shooting, and those things come down in favor I think of finding suitability." The court described this murder as "the low end of the scale."

The court employed a balancing test between the circumstances suffered by J.N. during his upbringing and the gravity of the offense. The court found the trauma suffered by J.N. had a mitigating effect, but not enough to reduce the gravity of the

19

offense. Based on this, the court found J.N. unsuitable under this factor. Substantial evidence does not support the court's finding.

The record establishes the court struggled with the factor relating to the gravity of the offense. Consistent with the statute, the court considered the actual behavior of the person. J.N. was shocked when the killing occurred and stood frozen. The court considered the mental state of the person and concluded J.N. did not have any intent to kill. As far as involvement in the crime, the court acknowledged J.N. was not the shooter. The court opined that in terms of the actual harm to the victim, there is nothing more serious than the killing of an unarmed person. But the court found the crime was not sophisticated and on the "low end of the scale" as far as homicides are concerned. But for the gang rival's aggression, the court found the killing likely would not have occurred. It was "just something that happened while they were there writing on the wall." The court stated it was giving "a lot of weight" to the evidence of trauma to J.N., and the lack of an appropriate role model, which would be appropriate considerations in terms of J.N.'s mental and emotional development.

The court made considerable factual findings mitigating the gravity of the offense. The only finding in aggravation in the record appears to be court's comment a crime "doesn't get much more serious than this when you have an unarmed person shot and killed." Yes, the *charge* against J.N. is murder and the loss of life is a grave and serious circumstance, but J.N. was not the killer. The statute does not exclude juveniles charged with murder from consideration for treatment in juvenile court. Yet, this appears to be what the court's thinking was. We cannot say substantial evidence supports the court's finding J.N. was not suitable for juvenile court treatment based on the gravity of the offense. Because we conclude substantial evidence does not support the court's findings in favor of unsuitability, possibility of rehabilitation and gravity of the offense, and there is no dispute the other three factors, criminal sophistication, prior delinquent history, and success of previous attempts to rehabilitate the minor, favored suitability, we

20

must conclude the court abused its discretion by concluding J.N. was not suitable for treatment in the juvenile court.

DISPOSITION

The order transferring J.N. to the criminal courts was an abuse of discretion. Respondent court's order transferring J.N. to the criminal courts must be rescinded and a new order denying the request to transfer J.N. must be entered.

Let a peremptory writ of mandate issue directing respondent court to vacate its order of June 1, 2017, finding J.N. was not a proper subject for treatment as a juvenile and ordering the court to enter a new order denying the section 707 petition. The alternative writ is discharged and the stay is dissolved.


O'LEARY, P. J.

WE CONCUR:


FYBEL, J.


IKOLA, J.